# EXHIBIT B



World Wrestling
Entertainment, Inc

EDWARD L. KAUFMAN
Executive Vice President
and General Counsel

1241 East Main St.
Stamford, CT 06902
Tel: 203 352 8786
Fax: 203 406 3653
Fax: 203 353 0236

**Via Federal Express**

December 12, 2005

Mr. Salvador Guerrero IV
17 Way Faire
Las Flores, CA  92688

Re:   **World Wrestling Entertainment, Inc. ("WWE") –w– Guerrero Ventures, Inc. / Loan Out Agreement dated June 3, 2004**

Dear Mr. Guerrero:

Reference is hereby made to that certain Loan Out Agreement between the parties dated June 3, 2004 and made effective as of April 6, 2004 (the "Loan Out Agreement") and the attached Booking Contract between you and WWE of even date therewith (the "Booking Contract"), in full force and effect as of the date hereof.  For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:/

1.     Due to your representation that Guerrero Ventures, Inc., the Lender under the above-referenced Loan Out Agreement, has been dissolved, you have agreed, represented and warranted that you will individually be responsible for the provisions of the Booking Contract and, accordingly, WWE agrees to pay any future amounts which may be due under the Booking Contract to you, Salvatore Guerrero IV, individually, rather than to



**World Wrestling Entertainment, Inc.**

Mr. Salvador Guerrero IV
Page 2 of 5

enclosed two (2) copies and return them to me. One (1) fully executed copy will be returned to you for your files. Thank you in advance for your prompt attention to this matter.

Very truly yours,

Edward L. Kaufman

ELK:my

cc:    John Laurinaitis
       Benny Morales
       Tom Bergamasco

ACCEPTED AND AGREED:

By: _____
    Salvador Guerrero IV

Date: _____
Social Security No.   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

GUERRERO VENTURES, INC.,
a corporation

By: _____
    Salvador Guerrero IV

WORLD WRESTLING
ENTERTAINMENT, INC.
("WWE"),

By: _____
    John Laurinaitis
    Vice President of Talent
    Relations

Date: _____

G:\Department\Legal Affairs\Loan Out Agreements\Guerrero, Salvador term Loan Out Agreement 12-2-05.doc



World Wrestling
Entertainment, Inc.

Mr. Salvador Guerrero IV
Page 3 of 5

STATE OF

COUNTY OF

**STATE OF CALIFORNIA**
**COUNTY OF ORANGE**

I am a Notary Public for said County and State, and do hereby certify that Salvador Guerrero IV personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

February 2006

WITNESS my hand and notarial seal this ___ day of December, 2005.

Notary Public

My commission expires: Mar. 16 2007

STATE OF CONNECTICUT )
                      ) ss: Stamford
COUNTY OF FAIRFIELD   )

**STATE OF CALIFORNIA**
**COUNTY OF ORANGE**

On December ___, 2005, before me personally came Salvador Guerrero IV, _____ of Guerrero Ventures, Inc., to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of Guerrero Ventures, Inc., and that he executed the same on behalf of said Company.

February 2006

WITNESS my hand and notarial seal this ___ day of December, 2005.

Notary Public

My commission expires: March 16 2007



SHOLEH SHARIF
Commission # 1405779
Notary Public - California
Orange County
My Comm. Expires Mar 16, 2007



**World Wrestling Entertainment, Inc.**

Mr. Salvador Guerrero IV
Page 4 of 5

STATE OF CONNECTICUT )
                                  ) ss: Stamford

COUNTY OF FAIRFIELD )

            February 2.
On ~~December~~ ___, 2005, before me personally came John Laurinaitis, Vice President of Talent Relations of World Wrestling Entertainment, Inc., to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of World Wrestling Entertainment, Inc., and that he executed the same on behalf of said Company.

                                                         February 6
WITNESS my hand and notarial seal this 2 day of ~~December~~, 2005.

                                         *Notary Public*

My commission expires: 12/31/10



**World Wrestling
Entertainment, Inc.**

EXHIBIT A

BOOKING CONTRACT

## WORLD WRESTLING ENTERTAINMENT, INC.
## BOOKING CONTRACT

This World Wrestling Entertainment, Inc. Booking Contract ("Agreement"), dated this third (3rd) day of May, 2004, and made effective as of April 6, 2004, by and between World Wrestling Entertainment, Inc., a Delaware corporation, with its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902 (hereinafter referred to as "PROMOTER"), Guerrero Ventures, Inc. ("Lender") f/s/o Salvador Guerrero IV, an individual residing at 17 Way Faire, Las Flores, California 92688 (hereinafter referred to as "WRESTLER").

### PREMISES

WHEREAS, PROMOTER is duly licensed, as required, to conduct professional wrestling exhibitions and is actually engaged in the business of organizing, publicizing, arranging, staging and conducting professional wrestling exhibitions and/or events, as defined below, throughout the world and of representing professional wrestlers in the promotion and exploitation of a professional wrestler's name, likeness, personality and character; and

WHEREAS, PROMOTER has established a nationwide network of television stations which regularly broadcast PROMOTER's wrestling programs for purposes of publicizing PROMOTER's professional wrestling exhibitions and/or events, as defined below, and PROMOTER has established a network of cable television programs which regularly broadcast PROMOTER's professional wrestling exhibitions on a pay-per-view basis; and in addition thereto, PROMOTER has developed and produced certain other television programs, which are also used to publicize, display and promote PROMOTER's professional wrestling exhibitions; and

WHEREAS, PROMOTER's business operations afford WRESTLER opportunities to wrestle and obtain public exposure which will increase the value of his wrestling services and his standing in the professional wrestling community and entertainment industry; and

WHEREAS, WRESTLER is duly licensed, as required, to engage in professional wrestling exhibitions and/or events, as defined below, and is actually engaged in the business of performing as a professional wrestler; and

WHEREAS, WRESTLER is a performing artist and the professional wrestling exhibitions arranged by PROMOTER constitute demonstrations of wrestling skills and abilities designed to provide athletic-styled entertainment to the public, and such professional wrestling exhibitions and events constitute entertainment and are not competitive sports; and

WHEREAS, WRESTLER desires PROMOTER to arrange professional wrestling exhibitions and/or events, as defined below, for WRESTLER and to assist WRESTLER in obtaining public exposure through live exhibitions, television programs, public appearances, and merchandising activities, or otherwise;

NOW THEREFORE, in consideration of the mutual promises and agreements as set forth

herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound, do hereby agree as follows:

## 1. BOOKING

1.1    WRESTLER hereby grants exclusively to PROMOTER, and PROMOTER hereby accepts, the following worldwide rights:

(a)    During the term of this Agreement as defined below, the right to engage WRESTLER's performance in wrestling matches at professional wrestling exhibitions, as well as appearances of any type at other events, engagements or entertainment programs in which WRESTLER performs services as a professional wrestler, entertainer or otherwise directed by PROMOTER in its sole discretion (collectively the "Events"), whether such Events are staged before a live audience, in a television broadcast studio, on location (for later viewing or broadcast) or otherwise.

(b)    During the term of this Agreement as defined below, the right, to sell or otherwise distribute tickets of admission to the general public for viewing of any or all of the Events that include the performance or appearance of WRESTLER, as well as on any closed circuit television, pay-per-view television, video exhibition, or any other medium now known or hereinafter discovered, of the Events.

(c)    During the term of this Agreement and thereafter, as provided for in this Agreement, the right to solicit, negotiate, and enter into agreements for and on behalf of WRESTLER for the exploitation of Intellectual Property (as defined hereinbelow) for merchandising, commercial tie-ups, publishing, personal appearances, performances in non-wrestling events, and endorsements.

1.2    In consideration of WRESTLER's granting of rights, license and other services, as set forth herein, and provided WRESTLER shall faithfully and fully perform all obligations hereunder, PROMOTER shall endeavor to book WRESTLER as an individual or as a member of a group, which determination shall be made in PROMOTER's sole discretion, in wrestling matches at various Events.

## 2. WORKS

2.1    If PROMOTER books WRESTLER to appear and perform at Events, WRESTLER hereby grants to PROMOTER and PROMOTER hereby accepts, the exclusive right during the term of this Agreement to video tape, film, photograph, or otherwise record, or to authorize others to do so, by any media now known or hereinafter discovered, WRESTLER's appearance, performance, commentary, and any other work product for any or all of the Events. (These recordings by tape, disc, film, or otherwise are collectively referred to herein as the "Programs".)

2.2    Notwithstanding the termination of this Agreement for any reason, and notwithstanding any other provision of this Agreement, PROMOTER shall have the right to produce, reproduce, reissue, manipulate, reconfigure, license, manufacture, record, perform, exhibit, broadcast, televise by any form of television (including without limitation, free, cable, pay cable, closed circuit and

2

pay-per-view television, the internet, video on demand, subscription video on demand), transmit, publish, copy, reconfigure, compile, print, reprint, vend, sell, distribute and use via the internet, video on demand, subscription video on demand, any other medium now known or hereinafter discovered, including without limitation, video on demand and the internet, and to authorize others to do so, the Programs, in perpetuity, in any manner or media and by any art, method or device, now known or hereinafter discovered (including without limitation, by means of videodisc, videocassette, optical, electrical and/or digital compilations, theatrical motion picture and/or non-theatrical motion picture). All gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible property provided to WRESTLER by PROMOTER and/or containing New Intellectual Property as defined in paragraph 3.2(a) shall be immediately returned to PROMOTER upon termination of this Agreement for any reason.

2.3    WRESTLER's appearance, performance and work product in any or all of the Events and/or Programs shall be deemed work for hire; and notwithstanding the termination of this Agreement, PROMOTER shall own, in perpetuity, all Programs and all of the rights, results, products and proceeds in and to, or derived from the Events and Programs (including without limitation, all incidents, dialogue, characters, actions, routines, ideas, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances at the Events and/or in the Programs) and PROMOTER may obtain copyright and/or trademark and/or any other legal protection therefor, now known or hereinafter discovered, in the name of PROMOTER and/or on behalf of PROMOTER's designee.

2.4    If PROMOTER directs WRESTLER, either singly or in conjunction with PROMOTER, to create, design or develop any copyrightable work (herein referred to as a "Development"), such Development shall be deemed work for hire and PROMOTER shall own such Development. All Programs and Developments referred to in this Agreement are collectively referred to as "Works."

2.5    All Works and WRESTLER's contributions thereto shall belong solely and exclusively to PROMOTER in perpetuity notwithstanding any termination of this Agreement. To the extent that such Works are considered: (i) contributions to collective works, (ii) a compilation, (iii) a supplementary work and/or (iv) as part or component of a motion picture or other audio-visual work, the parties hereby expressly agree that the Works shall be considered "works made for hire" under the United States Copyright Act of 1976, as amended (17 U.S.C. § 101 et seq.). In accordance therewith, all rights in and to the Works shall belong exclusively to PROMOTER in perpetuity, notwithstanding any termination of this Agreement. To the extent that such Works are deemed works other than "works made for hire," WRESTLER hereby assigns to PROMOTER all right, title and interest in and to all rights in such Works and all renewals and extensions of the copyrights or other rights that may be secured under the laws now or hereafter in force and effect in the United States of America or any other country or countries.

## 3. INTELLECTUAL PROPERTY

3.1    The parties agree that as of the date of this Agreement, all service marks, trademarks and any and all other distinctive and identifying indicia under which WRESTLER claims any rights, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world (collectively, the "Original Intellectual Property") are described and identified on Schedule A attached hereto and incorporated herein by reference. WRESTLER hereby assigns in good faith to PROMOTER and PROMOTER hereby accepts all worldwide right, title and interest in and to WRESTLER's Original Intellectual Property, including, but not limited to, the rights to license, reproduce, manipulate, promote, expose, exploit and otherwise use the Original Intellectual Property anywhere in the world in any commercial manner, media, art form, method or device now known or hereinafter discovered.

3.2    (a)    (i)    With the exception of WRESTLER's Original Intellectual Property, any service marks, trademarks and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, voice, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment during the Term of this Agreement (collectively the "New Intellectual Property") are hereby assigned to and shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement.

(b)    Upon the termination of this Agreement, all rights in and to the Original Intellectual Property shall revert to WRESTLER, except that PROMOTER, its licensees, sublicensees and assigns may continue to exploit any and all materials, goods, merchandise and other items incorporating the Original Intellectual Property made before such termination, until all such materials, goods and merchandise are sold off.

3.3    It is the intention of the parties that the New Intellectual Property belongs to PROMOTER, in perpetuity, even to the exclusion of WRESTLER, and shall survive the termination of this Agreement for any reason.    PROMOTER shall have the exclusive right to assign, license, sublicense, reproduce, promote, expose, exploit and otherwise use the New Intellectual Property in any commercial manner now known or hereinafter discovered, regardless of whether such rights are exercised during or after the Term of this Agreement and notwithstanding termination of this Agreement for any reason.

3.4    The Original Intellectual Property and the New Intellectual Property are hereinafter collectively referred to as "Intellectual Property."

3.5    WRESTLER agrees to cooperate fully and in good faith with PROMOTER for the purpose of securing and preserving PROMOTER's rights in and to the Intellectual Property. In connection herewith, WRESTLER acknowledges and hereby grants to PROMOTER the exclusive worldwide right during the Term of this Agreement (with respect to Original Intellectual Property) and in perpetuity (with respect to New Intellectual Property) to apply for and obtain trademarks, service marks, copyrights and other registrations throughout the world in PROMOTER's name and/or on behalf of Promoter's designee and to enforce any and all of WWE's rights therein.    At PROMOTER's expense and request, PROMOTER and WRESTLER shall take such steps, as PROMOTER deems necessary for any registration or any litigation or other proceeding, to protect and enforce any and all of PROMOTER's rights in the Original Intellectual Property and/or New Intellectual Property and/or Works. Further, WRESTLER authorizes PROMOTER to execute any documents on his behalf that are required by the U.S. Patent and Trademark Office in order to protect the aforementioned Intellectual Property.

## 4. MERCHANDISING

4.1    WRESTLER hereby agrees that PROMOTER shall have the exclusive right (i) during the Term of this Agreement and thereafter, as provided in this Agreement, to use the Original Intellectual Property and (ii) in perpetuity, to use the New Intellectual Property in connection with the manufacture, production, reproduction, reissuance, manipulation, reconfiguration, broadcast, rebroadcast, distribution, sale, and other commercial exploitation in any manner, now known or hereinafter discovered, of any and all materials, goods, merchandise and other items incorporating the Intellectual Property. As to all such materials, goods, merchandise or items created, developed, produced and/or distributed during the Term of this Agreement using the Original Intellectual Property, PROMOTER shall have the exclusive right to sell and exploit such materials, goods and merchandise until the sell-off of same. As to all such materials, goods, merchandise or items using the New Intellectual Property, PROMOTER shall have the exclusive right, in perpetuity, to sell and exploit same forever. By way of example and not of limitation, such items include t-shirts, posters, photos, video tapes and video cassettes, dolls, books, biographies, articles and stories, and any other such material, goods, merchandise, or items relating to WRESTLER.

4.2    It is the intention of the parties that PROMOTER's rights described under paragraph 4.1 are exclusive to PROMOTER even to the exclusion of WRESTLER. PROMOTER shall own all copyrights and trademarks in any and all such materials, goods, merchandise and items and shall be entitled to obtain copyright, trademark, service mark or other registrations in PROMOTER's name or on behalf of its designee; and    WRESTLER shall provide all reasonable assistance to PROMOTER in so obtaining such copyright, trademark, service mark or other registrations.

## 5. EXCLUSIVITY

5.1    It is the understanding of the parties that all rights, licenses, privileges and all other items herein given or granted or assigned by WRESTLER to PROMOTER are exclusive to PROMOTER even to the exclusion of WRESTLER.

5.2    In the event WRESTLER desires upon reasonable notice to PROMOTER during the Term

of this Agreement either individually or through his authorized representative(s) to participate in movies, films, commercials, product endorsements, videos, television programs or similar activities (collectively "Permitted Activities") and promotional events for the Permitted Activities, WRESTLER may do so subject to PROMOTER's approval, which shall not be unreasonably withheld or delayed provided a written sublicense is executed between PROMOTER, WRESTLER and any relevant third parties and further provided WRESTLER shall not utilize the New Intellectual Property in any manner in connection with such Permitted Activities without PROMOTER's written consent, and that PROMOTER retains first priority, to the exclusion of any such Permitted Activities, with respect to the use and scheduling of WRESTLER's services at all times during the Term (as defined below) of this Agreement. It is further agreed that PROMOTER shall receive from WRESTLER a management fee to reimburse PROMOTER for its reasonable administrative costs incurred in connection with WRESTLER's participation in each such Permitted Activity, provided that PROMOTER's costs shall not be less than ten percent (10%) of any fees received by WRESTLER for each such Permitted Activity described herein. Additionally, all monies earned by WRESTLER from such Permitted Activities in a specific Contract Year shall be credited against the Minimum Annual Compensation for that Contract Year as set forth in paragraph 7.1 below.

## 6. TERM AND TERRITORY

6.1    The term of the Agreement shall be three (3) years from the effective date hereof ("Term"). Each individual year of the Agreement may also be hereafter referred to as a Contract Year (i.e. April 6, 2004 through April 5, 2005 as the First Contract Year; April 6, 2005 through April 5, 2006 as the Second Contract Year; and April 6, 2006 through April 5, 2007 as the Third Contract Year).

6.4    The territory of this Agreement shall be the world.

## 7. PAYMENTS/ROYALTIES

7.1    (a)    Provided that WRESTLER fulfills all obligations and warranties and provided WRESTLER does not breach any of the terms of this Agreement, PROMOTER guarantees WRESTLER that the total of the payments made to WRESTLER shall amount in the aggregate to be no less than One Hundred Seventy Five Thousand Dollars ($175,000.00) for each Contract Year of this Agreement (referred to hereinafter as "Minimum Annual Compensation"), which shall be payable in fifty-two (52) equal weekly installments. In calculating such Minimum Annual Compensation, PROMOTER shall credit any payments earned by WRESTLER under the paragraphs of this Section 7 against the Minimum Annual Compensation. For the purposes of this paragraph, any royalty payments due under the Agreement shall be deemed "earned" only at the time they are paid to WRESTLER.

(b)    Subject to paragraphs 7.9, if applicable, and 10.2 (b) below, within one hundred twenty (120) days after the Contract Year has ended, if it is determined that WRESTLER has earned more than the Minimum Annual Compensation for services rendered during the Contract Year, WRESTLER shall be paid in one lump sum within fifteen (15) days thereafter the

difference between the Minimum Annual Compensation and what WRESTLER actually earned for services rendered during the Contract Year.

7.2 (a) If WRESTLER appears and performs in any Event produced by PROMOTER (not the Training Affiliates) in an arena before a live audience at which admission is charged other than those arena events which are taped or broadcast as set forth in paragraphs 7.2 (b) and 7.2 (c) below (hereinafter "House Shows"), Wrestler shall be paid by PROMOTER an amount equal, in PROMOTER's discretion, to such percentage of the paid receipts for such House Show from the live House Show gate receipts only as is consistent with the nature of the match in which WRESTLER appears, i.e., preliminary, mid-card, main event, etc. and any standards PROMOTER establishes specifically for such House Show.

(b) If WRESTLER appears and performs in connection with an arena or studio Event produced by PROMOTER (not the Training Affiliates) which is taped or broadcast for use on PROMOTER's television network ("TV Taping"), WRESTLER shall be paid by PROMOTER an amount not less than Fifty US Dollars ($50.00) for each day of TV Taping, if any, on which WRESTLER renders services hereunder in connection with the production of the TV Taping.

(c) If Wrestler appears and performs in connection with an arena or studio Event produced by PROMOTER (not the Training Affiliates) which is aired or broadcast via satellite broadcast or pay-per-view distribution technology for use by PROMOTER ("Pay-Per-View"), WRESTLER shall be paid by PROMOTER an amount in accordance with the nature of the match in which WRESTLER performs, i.e., preliminary card, mid card, main event, etc., or any other standard PROMOTER, in its sole discretion, establishes specifically for that Pay-Per-View.

7.3 (a) Licensed Product Royalties: In the event that the Original and/or New Intellectual Property are used by PROMOTER and/or licensed, sublicensed, or otherwise assigned to third parties for production, reproduction and/or sale and distribution, in conjunction with any consumer materials, goods or merchandise, (hereinafter collectively referred to as "Licensed Products"), such that the applicable Licensed Product only features the Original and/or New Intellectual Property, WRESTLER shall be paid twenty-five percent (25%) of the Licensed Products' Net Receipts received by PROMOTER with respect to any such licensing, sublicensing or assignment. Licensed Products' Net Receipts means the gross amount received by PROMOTER less expenses incurred by PROMOTER or its licensing agent for the applicable Licensed Product. WRESTLER acknowledges and agrees that WRESTLER shall not be eligible for any royalties with respect to television license, television subscription fees, internet subscription fees, subscription video on demand fees and/or advertising and/or distribution fees paid to PROMOTER by any entity in connection with the exploitation of Original and/or New Intellectual Property.

(b) In the event that the Original and/or New Intellectual Property are used by PROMOTER or licensed, sublicensed, or otherwise assigned to third parties in connection with Licensed Products featuring WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate twenty-five percent (25%) of the Licensed Products Net Receipts, to be paid pro-rata among WRESTLER and all other talent so featured.

7

7.4 (a) (i) <u>Direct Sales Royalties/Feature Performer</u>: In the event that PROMOTER distributes and sells directly any Licensed Products other than any WWE Pay-Per-Views, as set forth in paragraph 7.5(c), below or any WWE Video Products, as set forth in Paragraph 7.5(d) below, including without limitation, at the arena, via mail order sales or directly on television, or via the Internet (hereinafter "Direct Sales Products"), such that the applicable product only features the Original and/or New Intellectual Property of the WRESTLER, WRESTLER shall be paid five percent (5%) of the Direct Sales Products' Net Receipts derived by PROMOTER from such exploitation. For purposes of this paragraph, Direct Sales Products' Net Receipts mean the gross amount received by PROMOTER for sales of such products after deduction of cost of goods, local taxes and applicable allocations for such sales. Should such sales take place at any of Promoter's site based entertainment complexes, WRESTLER shall be paid 5% of Direct Site Based Sales Products Net Receipts derived by PROMOTER from such exploitation. For purposes of paragraphs 7.4(a) and 7.4 (b) Direct Site Based Sales Products' Net Receipts means the gross amount received by PROMOTER for sales of such products after applicable taxes and the average venue deduction taken in the quarter of the sale of Licensed Products by PROMOTER at Events.

(ii) <u>Direct Sales Web/Catalog Royalties</u>: In the event that WWE distributes and sells directly any Licensed Products other than the WWE Pay-Per-Views, as set forth below, or any WWE Video Products, as set forth below, via mail order sales or directly on television, or via the internet sites owned and controlled by WWE (hereinafter "Direct Sales Web/Catalog Products"), Talent shall be paid five percent (5%) of the Direct Sales Web Catalog Products Net Receipts, defined as gross receipts to WWE reduced by returns and a thirty percent (30%) WWE administrative fee.

(iii) <u>Direct Sales/Pro Rata</u>: In the event that the Original and/or New Intellectual Property of the WRESTLER are exploited by PROMOTER, such that Direct Sales Products feature WRESTLER with other wrestlers represented by PROMOTER, PROMOTER shall allocate five percent (5%) of the Direct Sales Products Net Receipts or the Direct Site Based Sales Products Net Receipts, as the case may be, to be paid pro-rata among WRESTLER and all other talent so featured.

(iv) <u>Auction Sales</u>: PROMOTER shall have the right to sell via the Internet, television or through any other distribution channel by an auction method, any merchandise containing WRESTLER'S Intellectual Property which shall include but not be limited to WRESTLER'S name, signature or any product, costume and/or prop worn by WRESTLER during an Event ("Auction Sale"). In respect of an Auction Sale, WRESTLER shall, in accordance with the payment schedule set forth in this Agreement, receive thirty five (35%) percent of the "Net Sales" (as defined herein) from the Auction Sale. For purposes of this subsection, "Net Sales" shall be defined as the gross revenue received for an Auction Sale less (i) the cost of goods related to the item sold; (ii) any shipping or freight charges; and (iii) PROMOTER'S administrative fee which shall be equal to thirty percent (30%) of the gross revenue received from the Auction Sale of the item sold.

7.5    (a)    (i) Royalties/Pay-Per-View Videos Sold By Licensees: PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created (hereinafter referred to as "WWE Video Products"), of WWE pay-per-views in their entirety ("WWE Pay-Per-Views") to a talent royalty pool. Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WWE Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view. For purposes of paragraphs 7.5(a)(i) and 7.5(a)(ii), Net Receipts shall mean the gross amount received by PROMOTER from the licensees for the WWE Pay-Per-Views less any and all costs incurred by PROMOTER to produce and/or distribute such WWE Pay-Per-Views.

(ii) In the event that the WWE Video Products are a compilation or derivative work of multiple individual WWE Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be in the same proportion with the royalty payment to the WRESTLER at the time that each individual video was first released.

(b)    Royalties/Non-Pay-Per-View Videos Sold By Licensees:    PROMOTER shall allocate twenty-five percent (25%) of the Net Receipts paid to PROMOTER by licensees authorized to reproduce and sell all other WWE Video Products, other than those set forth in paragraphs 7.5(a)(i) and 7.5(a)(ii) above, to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all other talent appearing in such WWE Video Products pro-rata among WRESTLER and all other talent so featured. For purposes of this paragraph 7.5(b), Net Receipts shall mean the gross amount received by PROMOTER for the WWE Video Products less any and all costs incurred by PROMOTER to produce and/or distribute such WWE Video Products.

(c)    (i) Royalties/Pay-Per-View Videos Sold By Promoter: PROMOTER shall allocate five percent (5%) of the Net Receipts paid to PROMOTER with respect to the direct sale by PROMOTER of WWE Pay-Per-Views to a talent royalty pool. Thereafter, PROMOTER shall pro-rate payment to WRESTLER and all other talent appearing in such WWE Pay-Per-Views in the same proportion as was the compensation paid to WRESTLER for his appearances in the pay-per-views to the total amount paid to all talent for their appearances on the pay-per-views. For purposes of paragraphs 7.5(c)(i) and 7.5(c)(ii), Net Receipts shall mean the gross amount received by PROMOTER for the WWE Pay-Per-Views. In the event the WWE Pay-Per-Views are sold at any of PROMOTER's site based entertainment complexes, then the definition of WWE Pay-Per-View Site Based Net Receipts shall mean the gross amount received by promoter for sales of such products after deduction of applicable taxes and the average venue deduction taken in the quarter of the sale of Licensed Products by PROMOTER at Events.

(ii) In the event that the WWE Video Product is a compilation or derivative work of multiple individual WWE Pay-Per-Views in their entirety, such as a collection of videos, e.g., a Wrestlemania box set, payment to WRESTLER shall be calculated as follows: five percent (5%) of

9

the Net Receipts paid to PROMOTER shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to WRESTLER for each video shall be consistent with the royalty payment to the WRESTLER at the time each individual video was first released. In the event the WWE Video Product is sold at any of PROMOTER'S site based entertainment complexes, then the definition of WWE Video Product Site Based Net Receipts shall mean the gross amount received by promoter for sales of the WWE Video Product after deduction of cost of goods, local taxes and the average venue deduction taken in the immediately preceding quarter in connection with the sale of Licensed Products by PROMOTER at Events.

(d) Royalties/Non Pay-Per-View Videos Sold By Promoter: PROMOTER shall allocate five percent (5%) of the Net Receipts paid to PROMOTER with respect to the direct sale by PROMOTER of all other WWE Video Products other than those set forth in paragraphs 7.5(c)(i) and 7.5(c)(ii) above, to a talent royalty pool, from which PROMOTER shall pay WRESTLER and all other talent appearing in such WWE Video Products pro-rata among WRESTLER and all other talent so featured. For purposes of this paragraph 7.5(d), Net Receipts shall mean the gross amount received by PROMOTER for the WWE Video Products. Notwithstanding the foregoing, if WRESTLER is deemed to be the "featured performer" as determined by PROMOTER in its sole discretion, WRESTLER shall receive a bonus of an additional five percent (5%) of WWE's Net Receipts up to the sale of the first one hundred fifty thousand (150,000) units. Once sales exceed 150,000, WRESTLER as a featured performer shall receive ten percent (10%) of WWE's Net Receipts on all units sold, including the first 150,000 units. For example, the featured performer in the video entitled "Just Bring It" is "The Rock". If WRESTLER is part of a group that is determined to be the "featured performer", WRESTLER shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WWE Video Products. For example, the featured performers in the video entitled "Regeneration X" are five members of the group Degeneration X.

7.6 If PROMOTER instructs WRESTLER to appear and perform in any Events or Programs as a commentator and/or to participate in post-Event production and/or voice-over activities as a commentator, WRESTLER's commentating shall be deemed work-for-hire and WRESTLER hereby assigns to PROMOTER and PROMOTER shall own all rights, in perpetuity, to all of WRESTLER's commentary and WRESTLER shall not be entitled to receive any royalty payments, or any additional compensation or residual payments whatsoever, as a result of PROMOTER's commercial exploitation of such commentary in any form, whether broadcast programming, cable programming, pay-per-view programming, videotapes, videodiscs, the Internet or other mediums now or hereinafter discovered.

7.7 It is the understanding of the parties that WRESTLER shall not be paid anything for PROMOTER's exploitation of the Original and/or New Intellectual Property in any of PROMOTER's magazines or other publications, which PROMOTER may publish, produce or distribute at arenas and/or by mail or through electronic or any other manner of media or distribution, now known or hereinafter discovered, including, but not limited to, publication or distribution on the internet or with respect to any television license, television subscription fees, internet subscription fees, subscription video on demand fees, and/or advertising and/or distribution

fees paid to WWE by any entity in connection with the exploitation of the Intellectual Property.

7.8     If WRESTLER is unable to wrestle for eight (8) consecutive weeks due to an injury suffered in the ring while performing services at PROMOTER's direction, for every house show or television show per Contract Year in which WRESTLER is unable to wrestle thereafter, WRESTLER's Minimum Annual Compensation as defined below for that Contract Year shall be reduced by .5%.     Additionally, for every pay-per-view event per Contract Year in which WRESTLER is unable to wrestle, WRESTLER's Minimum Annual Compensation for that Contract Year shall be reduced by the average pay received by WRESTLER for the three (3) immediately preceding or fewer if less than three (3) similar pay-per-view events for which he was compensated, or .5% if there are none. If WRESTLER is unable to wrestle for any other reason during the Term of this Agreement, such deductions shall begin immediately.

7.9     Subject to paragraph 12.2, the non-compete provisions of this Agreement, it is acknowledged and agreed that as it relates to WRESTLER's appearance or performance of any services pursuant to this Agreement, including the appearance and or performance of WRESTLER's services at Events or other activities conducted by PROMOTER, WRESTLER shall be eligible only for the payments and royalties specifically set forth in paragraphs 7.1 through 7.6. WRESTLER acknowledges and agrees that any payments or royalties earned in connection with any wrestling services WRESTLER may perform during the term of this Agreement for any other wrestling/sports entertainment organization and /or entity shall be credited against WRESTLER's Minimum Annual Compensation, if any.

7.10    All payments made to WRESTLER are in full without withholding, except where required by law. After the end of each calendar year, PROMOTER shall issue to WRESTLER Internal Revenue Service Form 1099 showing all payments to WRESTLER during that calendar year.

7.11    (a)     PROMOTER shall prepare and send statements as to royalties payable hereunder to WRESTLER within ninety (90) days following the end of each quarter, based upon the royalties received and processed by PROMOTER in the previous quarter, together with payment of royalties, if any, earned by WRESTLER hereunder during such quarter-annual period, less advances and/or debits made by PROMOTER on WRESTLER's behalf.

        (b)     PROMOTER shall maintain books of account related to the payment of royalties hereunder at its principal place of business.     WRESTLER, or WRESTLER's designated independent certified public accountant who is a member in good standing of the AICPA, may at WRESTLER's sole expense examine PROMOTER's books insofar as they pertain to this Agreement for the purpose of verifying the accuracy thereof, during PROMOTER's normal business hours and upon reasonable notice. Such audit shall be conducted in a manner that will not unreasonably interfere with PROMOTER's normal business operations. WRESTLER shall not audit PROMOTER's books and records more than twice during any calendar year and no such audit shall be conducted later than one (1) year after the most recent statement of royalties is given, delivered or sent to WRESTLER. Each audit is limited to five (5) days in duration. Statements of royalties may be changed from time to time to reflect year-end adjustments, to correct clerical errors and for similar purposes.

(c) WRESTLER shall be deemed to have consented to all statements of royalties and all other accountings provided by PROMOTER hereunder and each such statement of royalties or other accounting shall be conclusive, final, and binding; shall constitute an account stated; and shall not be subject to any objection for any reason whatsoever unless an audit has been conducted by WRESTLER to PROMOTER within eighteen (18) months from the date the royalty statement was given, delivered or sent to WRESTLER.

(d) No claim shall be filed pursuant to paragraph 13.8 below against PROMOTER or PROMOTER's affiliates that disputes any statement of royalties or accounting given by PROMOTER hereunder or that makes any claim for royalties or royalty payments, unless the same is commenced or filed within eighteen (18) months after the date such statement or accounting is first given, delivered or sent to WRESTLER, and unless WRESTLER has first exhausted his remedies pursuant to paragraphs 7.11(b) and (c) above.

## 8. PROMOTER'S OBLIGATIONS

8.1 Although under paragraph 9.1 WRESTLER shall bear responsibility for obtaining appropriate licenses for participating in wrestling exhibitions, PROMOTER shall be responsible for obtaining all other appropriate licenses to conduct professional wrestling exhibitions involving WRESTLER. If PROMOTER, at its discretion, agrees to assist WRESTLER in obtaining his licenses, WRESTLER shall reimburse PROMOTER for its fees and expenses incurred in connection therewith.

8.2 PROMOTER shall bear the following costs in connection with the development and enhancement of the value of WRESTLER's performance hereunder and WRESTLER's standing in the professional wrestling community, all of which shall benefit WRESTLER:

(a) In connection with WRESTLER's appearances and performance at Events staged before a live audience, PROMOTER shall bear the cost of location rental, PROMOTER's third party comprehensive liability insurance for the benefit of the venues, applicable state and local admission taxes, promotional assistance, sound and light equipment, wrestling ring, officials, police and fire protection, and such additional security guards as PROMOTER shall require in its discretion during a professional wrestling match;

(b) In connection with the production, distribution, and exploitation of the Programs, PROMOTER shall bear all costs incurred in connection with such production, distribution, broadcast, transmission or other forms of mass media communication;

(c) In connection with any product or service licensing activities and/or merchandising activities, PROMOTER shall bear all costs of negotiating, securing or otherwise obtaining the product or service licensing arrangements, including costs of agents, consultants, attorneys and others involved in making the product or service licensing activities; and PROMOTER shall bear all costs of creating, designing, developing, producing and marketing merchandise or services. In order to fulfill these obligations, PROMOTER may make any arrangements, contractual or

otherwise, it deems appropriate to delegate, assign, or otherwise transfer its obligations.

8.3     PROMOTER shall schedule the Events and book WRESTLER for the Events. In doing so, PROMOTER shall select the time and location of the Events at which WRESTLER is booked, WRESTLER's opponent, and any other wrestlers who will appear at such Event. PROMOTER shall provide WRESTLER with reasonable advance notice of the date, time, and place of any such Event, and WRESTLER shall appear at the designated location for any such Event no later than one hour before the designated time. If WRESTLER fails to appear as required without advance twenty-four (24) hours notice to PROMOTER and PROMOTER must substitute another wrestler to appear in WRESTLER's place at the Event, then PROMOTER may fine, suspend or terminate WRESTLER in its sole discretion.

8.4     Notwithstanding the above, if WRESTLER shall be prevented from appearing at an Event by reason of Force Majeure, the above fines shall not be imposed. For purposes of this Agreement, Force Majeure shall mean any act of God, fire, flood, war or other calamity; strike or labor difficulties; any governmental action or any other serious emergency affecting WRESTLER which occurrence is beyond WRESTLER's reasonable control, and, which despite best efforts prohibits WRESTLER's performance or appearance at such Event.

## 9. WRESTLER'S OBLIGATIONS

9.1     WRESTLER shall bear responsibility for obtaining all appropriate licenses to engage in, participate in, or otherwise appear in professional wrestling exhibitions.

9.2     WRESTLER shall be responsible for WRESTLER's own training, conditioning, and maintenance of wrestling skills and abilities, as long as they do not interfere with WRESTLER's appearance at scheduled events as follows:

(a)     WRESTLER shall establish his own training program, shall select time of training, duration of training, exercises, pattern of exercise and other actions appropriate to obtaining and maintaining physical fitness for wrestling. WRESTLER shall select his own training apparatus, including mats, weights, machines and other exercise paraphernalia. WRESTLER is responsible for supplying his own training facilities and equipment, whether by purchase, lease, license, or otherwise.

(b)     WRESTLER shall establish his own method of physical conditioning, shall select time for conditioning, duration of conditioning and form of conditioning. WRESTLER shall select time for sleep, time for eating, and time for other activities. WRESTLER shall select his own foods, vitamins and other ingested items, excepting illegal and/or controlled substances and drugs, which are prohibited by PROMOTER's drug policy.

9.3     WRESTLER shall be responsible for providing all costumes, wardrobe, props, and make-up necessary for the performance of WRESTLER's services at any Event and WRESTLER shall bear all costs incurred in connection with his transportation to and from any such Events (except for those transportation costs which are covered by PROMOTER's then current Travel Policy), as well

as the costs of food consumed and hotel lodging utilized by WRESTLER in connection with his appearance at such Events.

9.4    WRESTLER shall use best efforts in employing WRESTLER's skills and abilities as a professional wrestler and be responsible for developing and executing the various details, movements, and maneuvers required of wrestlers in a professional wrestling exhibition.

9.5    WRESTLER shall take such precautions as are appropriate to avoid any unreasonable risk of injury to himself and to others in any and all Events. These precautions shall include, without limitation, pre-match review of all wrestling moves and maneuvers with wrestling partners and opponents; and pre-match demonstration and/or practice with wrestling partners and opponents to insure familiarity with anticipated wrestling moves and maneuvers during a wrestling match. In the event of injury to WRESTLER, and/or WRESTLER's partners and opponents during a wrestling match, WRESTLER shall immediately signal partner, opponent and/or referees that it is time for the match to end; and WRESTLER shall finish the match forthwith so as to avoid aggravation of such injury.

9.6    WRESTLER shall use best efforts in the ring in the performance of wrestling services for a match or other activity, in order to provide an honest exhibition of WRESTLER's wrestling skills and abilities, consistent with the customs of the professional wrestling industry; and WRESTLER agrees all matches shall be finished in accordance with the PROMOTER's direction. Breach of this paragraph shall cause a forfeiture of any payment due WRESTLER pursuant to Section 7 of this Agreement and all other obligations of PROMOTER to WRESTLER hereunder, shall entitle PROMOTER to terminate this Agreement, or suspend WRESTLER without pay, but such breach shall not terminate PROMOTER's licenses and other rights under this Agreement. If PROMOTER in its discretion suspends this Agreement, when reinstated, PROMOTER may extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof and this Agreement will therefore continue to be of full force and effect throughout the remainder of the Term.

9.7    WRESTLER agrees to cooperate and assist without any additional payment in the publicizing, advertising and promoting of scheduled Events, including without limitation, appearing at and participating in a reasonable number of joint and/or separate press conferences, interviews, and other publicity or exploitation appearances or activities (any or all of which may be filmed, taped, or otherwise recorded, telecast by any form of television now known or hereafter discovered, including without limitation free, cable, pay cable, and closed circuit and pay-per-view television, broadcast, exhibited, distributed, and used in any manner or media and by any art, method, or device now known or hereafter created, including without limitation by means of videodisc, video cassette, theatrical motion picture and/or non-theatrical motion picture and Internet), at times and places designated by PROMOTER, in connection therewith.

9.8    WRESTLER acknowledges the right of PROMOTER to make decisions with respect to the preparation and exploitation of the Programs and/or the exercise of any other rights respecting Original and/or New Intellectual Property, and in this connection WRESTLER acknowledges and agrees that PROMOTER's decision with respect to any agreements disposing of the rights to the

Original and/or New Intellectual Property are final, except as to WRESTLER's legal name, which PROMOTER may only dispose of upon WRESTLER's written consent. WRESTLER agrees to execute any agreements PROMOTER deems necessary in connection with any such agreements, and if WRESTLER is unavailable or refuses to execute such agreements, PROMOTER is hereby authorized to do so in WRESTLER's name as WRESTLER's attorney-in-fact.

9.9     WRESTLER agrees to cooperate fully and in good faith with PROMOTER to obtain any and all documentation, applications or physical examinations as may be required by any governing authority with respect to WRESTLER's appearance and/or performance in a professional wrestling match.

9.10    WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of them harmless against any claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them by reason of WRESTLER's breach or alleged breach of any warranty, undertaking, representation, agreement, or certification made or entered into herein or hereunder by WRESTLER. WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, shall indemnify and defend PROMOTER and PROMOTER's licensees, assignees, parent corporation, subsidiaries and affiliates and its and their respective officers, directors, employees, advertisers, insurers and representatives and hold each of the harmless against any and all claims, demands, liabilities, actions, costs, suits, attorneys' fees, proceedings or expenses, incurred by any of them, arising out of WRESTLER'S acts, transactions and/or conduct within or around the ring, hallways, dressing rooms, parking lots, or other areas within or in the immediate vicinity of the facilities where PROMOTER has scheduled Events at which WRESTLER is booked. Such indemnification shall include all claims arising out of any acts, transactions and/or conduct of WRESTLER or others occurring at Events or in connection with any appearances or performances by WRESTLER not conducted by PROMOTER in accordance with this Agreement. PROMOTER on behalf of its parent company, subsidiaries, successors and assigns and its and their officers, directors, employees, agents and representatives shall indemnify and defend WRESTLER and hold WRESTLER harmless against any claims, demands, liabilities, actions, costs, suits reasonable attorney fees, proceedings or expenses, incurred by WRESTLER by reason of PROMOTER's breach of any warranty, undertaking, representation, agreement or certification made under this Agreement.

9.12    WRESTLER shall be responsible for payment of all of WRESTLER's own Federal, state or local income taxes; all social security, FICA and FUTA taxes, if any, as well as all contributions to retirement plans and programs, or other supplemental income plan or program that would provide WRESTLER with personal or monetary benefits upon retirement from professional wrestling.

9.13    (a)     WRESTLER shall be responsible for his own commercial general liability insurance, worker's compensation insurance, professional liability insurance, as well as any excess liability insurance, as WRESTLER deems appropriate to insure, indemnify and defend WRESTLER with respect to any and all claims arising out of WRESTLER's own acts,

transactions, or conduct .

(b)     WRESTLER acknowledges that the participation and activities required by WRESTLER in connection with WRESTLER's performance in a professional wrestling exhibition are dangerous and involve the risk of serious bodily injury, including death. WRESTLER knowingly and freely assumes full responsibility for all such inherent risks as well as those due to the reckless conduct and/or negligence of PROMOTER or other wrestlers.

(c)     WRESTLER, on behalf of himself and his heirs, successors, assigns and personal representatives, hereby releases, waives and discharges PROMOTER from all liability to WRESTLER and covenants not to sue PROMOTER for any and all loss or damage on account of injury resulting in serious or permanent injury to WRESTLER or WRESTLER's death, whether caused by the reckless conduct and/or negligence of the PROMOTER or other wrestlers.

9.14    (a)    WRESTLER may at his election obtain health, life and/or disability insurance to provide benefits in the event of physical injury arising out of WRESTLER's professional activities; and WRESTLER acknowledges that PROMOTER shall not have any responsibility for such insurance or payment in the event of physical injury arising out of WRESTLER's professional activities.

(b)     In the event of physical injury arising out of WRESTLER's professional activities, WRESTLER acknowledges that WRESTLER is not entitled to any worker's compensation coverage or similar benefits for injury, disability, death or loss of wages from PROMOTER; and WRESTLER shall make no claim against PROMOTER for such coverage or benefit.

9.15    WRESTLER shall act at all times with due regard to public morals and conventions during the term of this Agreement. If WRESTLER shall have committed or shall commit any act or do anything that is or shall be an offense or violation involving moral turpitude under Federal, state or local laws, or which brings WRESTLER into public disrepute, contempt, scandal or ridicule, or which insults or offends the community or any employee, agent or affiliate of PROMOTER or which injures WRESTLER's reputation in PROMOTER's sole judgment, or diminishes the value of WRESTLER's professional wrestling services to the public or PROMOTER, then at the time of any such act, or any time after PROMOTER learns of any such act, PROMOTER shall have the right to fine WRESTLER in an amount to be determined by PROMOTER; and PROMOTER shall have the right to suspend and/or terminate this Agreement forthwith. In the event that WWE elects to terminate this Agreement, WWE's only financial obligation shall be to pay Talent's Minimum Annual Compensation through the date of termination.

9.16    During the Term, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity for any other wrestling organization and/or entity not owned or controlled by PROMOTER or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-view or other televised events.

## 10. WARRANTY

10.1    WRESTLER represents, warrants, and agrees that WRESTLER is free to enter into this Agreement and to grant the rights and licenses herein granted to PROMOTER; WRESTLER has not heretofore entered and shall not hereafter enter into any contract or agreement which is in conflict with the provisions hereof or which would or might interfere with the full and complete performance by WRESTLER of his obligations hereunder or the free and unimpaired exercise by PROMOTER of any of the rights and licenses herein granted to it; WRESTLER further represents and warrants there are no prior or pending claims, administrative proceedings, civil lawsuits, criminal prosecutions or other litigation matters, including without limitation any immigration or athletic commission related matters, affecting WRESTLER which would or might interfere with PROMOTER's full and complete exercise or enjoyment of any rights or licenses granted hereunder. Any exceptions to this Warranty are set forth in Schedule B, attached hereto.

10.2    (a)    WRESTLER represents, warrants and agrees that WRESTLER is in sound mental and physical condition; that WRESTLER is suffering from no disabilities that would impair or adversely affect WRESTLER's ability to perform professional wrestling services; and that WRESTLER is free from the influence of illegal drugs or controlled substances, which can threaten WRESTLER's well being and pose a risk of injury to WRESTLER or others. To insure compliance with this warranty, WRESTLER shall abide by PROMOTER's drug policy for wrestlers, as conveyed to WRESTLER and/or his representative, as well as any and all amendments, additions, or modifications to the PROMOTER's drug policy implemented during the Term of this Agreement and consents to the sampling and testing of his urine in accordance with such Policy. In addition, WRESTLER agrees to submit annually to a complete physical examination by a physician either selected or approved by PROMOTER.

        (b)    In the event that WRESTLER is unable to wrestle for eight (8) consecutive weeks during the Term of this Agreement due to an injury suffered in the ring while performing services at PROMOTER's direction, PROMOTER shall have the right to thereafter terminate this Agreement or suspend WRESTLER without pay. If WRESTLER is unable to wrestle for any other reason during the Term of this Agreement, PROMOTER shall have the right to immediately terminate this Agreement or suspend WRESTLER without pay. PROMOTER can opt in its discretion to extend the Term of this Agreement for a period of time equal to the period of suspension or any portion thereof. Upon certification by WRESTLER or PROMOTER's physician during any period of suspension that WRESTLER is fully recovered and capable of performing all services as required under this Agreement, PROMOTER can reinstate the Agreement, and it will therefore continue to be of full force and effect throughout the remainder of the Initial Term of this Agreement and any Renewal Term thereof.

10.3    WRESTLER reserves the right to be examined by a physician of its own choosing at its expense at any point during the Term of this Agreement.

## 11. EARLY TERMINATION

11.1    (a) This Agreement may be terminated by PROMOTER during the Term for any reason whatsoever by providing WRESTLER ninety (90) days advance written notice of said termination.

G:\Department\Legal Affairs\Booking Contracts\Guerrero IV, Salvador 2004 CLEAN 5-18-04.doc

(b) This Agreement may also be terminated prior to the end of its Term by a written instrument executed by each of the parties expressing their mutual consent to so terminate without any further liability on the part of either.

(c) In the event of such early termination, PROMOTER shall pay WRESTLER for all uses of the Intellectual Property in accordance with paragraphs 7.3, 7.4, 7.5 and 7.6.

11.2   This Agreement will be terminated by WRESTLER's death during the Term, with no further compensation due WRESTLER's heirs, successors, personal representatives or assigns.

11.3   Upon the termination of this Agreement for any reason, including breach, the parties acknowledge and agree that PROMOTER shall own all right, title and interest in all Works, New Intellectual Property and any registrations thereof and PROMOTER shall have the exclusive right to sell or otherwise dispose of any materials, goods, merchandise or other items (i) produced during the Term of this Agreement incorporating any Original Intellectual Property, and (ii) produced incorporating New Intellectual Property, in perpetuity.

## 12. BREACH

12.1   In addition to those reasons set forth elsewhere in this Agreement, PROMOTER shall have the right, in its sole discretion, to immediately suspend or terminate the operation of this Agreement, both as to services and compensation, if any of the following occurs:

(a)   WRESTLER violates PROMOTER's drug policy as conveyed to WRESTLER and/or his representative or fails PROMOTER's pre-contract drug screening;

(b)   WRESTLER is habitually late and/or absent for scheduled Events or appearances as PROMOTER determines in its sole discretion;

(c)   WRESTLER fails any physical examination conducted on behalf of PROMOTER, as required herein;

(d)   WRESTLER fails to maintain physical condition or training such that his weight, and/or his performance is unsatisfactory as determined by PROMOTER in its sole discretion; or

(e)   PROMOTER is unable to obtain any necessary athletic commission licenses or immigration clearances for WRESTLER.

12.2   In the event WRESTLER breaches this Agreement, PROMOTER may recover such actual direct damages as may be established in a court of law, as provided in Paragraph 13.8. In addition, in the event of termination pursuant to this Paragraph, WRESTLER shall forfeit any future payments due pursuant to paragraph 7 and WRESTLER shall not appear under, use, refer to or exploit in any manner, parenthetically or otherwise, the Original Intellectual Property for the remainder of the Term and the New Intellectual Property forever.   Further, at PROMOTER's

sole option, the Term of this Agreement may be extended by the term of any suspension period, in whole or in part, with all other terms and conditions hereof remaining in full force and effect during such extended period. In the event WRESTLER breaches this Agreement, WRESTLER acknowledges and agrees that he shall not work or perform in any capacity in the United States for any other wrestling organization and/or entity not owned or controlled by PROMOTER or any affiliated or subsidiary company thereof, including without limitation appearances in live events, pay-per-view or other televised events, for one (1) year from the date of the termination of this Agreement as a result of breach of this Agreement by WRESTLER.

12.3   The parties further agree that because of the special, unique, and extraordinary nature of the obligations of PROMOTER and WRESTLER respecting all rights and licenses concerning bookings, promoting, Programs, Events, Intellectual Property, which are the subject matter of this Agreement, WRESTLER's breach of this Agreement shall cause PROMOTER irreparable injury which cannot be adequately measured by monetary relief; as a consequence PROMOTER shall be entitled to seek injunctive and other equitable relief against WRESTLER to prevent WRESTLER's breach or default hereunder and such injunction or equitable relief shall be without prejudice to any other rights, remedies or damages which PROMOTER is legally entitled to obtain.

12.4   In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

## 13. MISCELLANEOUS

13.1   Nothing contained in this Agreement shall be construed to constitute WRESTLER as an employee, partner or joint venturer of PROMOTER, nor shall WRESTLER have any authority to bind PROMOTER in any respect. WRESTLER is an independent contractor and WRESTLER shall execute and hereby irrevocably appoints PROMOTER attorney-in-fact to execute, if WRESTLER refuses to do so, any instruments necessary to accomplish or confirm the foregoing or any and all of the rights granted to PROMOTER herein.

13.2   This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and all prior understandings, negotiations and agreements are merged in this Agreement, including without limitation that certain Booking Contract between PROMOTER and WRESTLER dated June 14, 2001 with an effective date of July 20, 2001, as amended. There are no other agreements, representations, or warranties not set forth herein with respect to the subject matter hereof; and the parties expressly acknowledge that any representation, promise or inducement by any party to any other party that is not embodied in this Agreement is not part of this Agreement, and they agree that no party shall be bound by or liable for any such alleged representation, promise or inducement not set forth herein.

13.3   This Agreement may not be changed or altered except in writing signed by PROMOTER and WRESTLER.

13.4   If any provision or clause of this Agreement, or portion thereof, shall be held by any court or

19
G:\Department\Legal Affairs\Booking Contracts\Guerrero IV, Salvador 2004 CLEAN 5-18-04.doc

other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable in such jurisdiction, the remainder of such provision shall not thereby be affected and shall be given full effect, without regard to the invalid portion. It is the intention of the parties that, if any court construes any provision or clause of this Agreement, or any portion thereof, to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered thereby, such court shall reduce or modify the duration, area, or matter of such provision, and, in its reduced or modified form, such provision shall then be enforceable and shall be enforced.

13.5    PROMOTER shall have the right to assign, license, or transfer any or all of the rights granted to and hereunder to any person, firm or corporation, provided that such assignee has the financial ability to meet the Promoter's obligations hereunder, and if any assignee shall assume in writing PROMOTER's obligations hereunder, PROMOTER shall have no further obligations to WRESTLER. WRESTLER may not assign, transfer or delegate his rights or obligations hereunder and any attempt to do so shall be void.

13.6    Any notices required or desired hereunder shall be in writing and sent postage prepaid by certified mail, return receipt requested, or by prepaid telegram addressed as follows, or as the parties may hereafter in writing otherwise designate:

TO PROMOTER:

World Wrestling Entertainment, Inc.
Attn:   Edward L. Kaufman
Executive Vice President and General Counsel
1241 E. Main Street
Stamford, CT  06902

TO WRESTLER:

Guerrero Ventures, Inc.
Salvador Guerrero IV
17 Way Faire
Las Flores, CA  92688

WITH A COPY TO:

Brad Small, Esq.
Manatt, Phelps & Phillips
11355 Olympic Boulevard
Los Angeles, CA  90064

The date of mailing shall be deemed to constitute the date of service of any such notice by PROMOTER. The date of receipt shall be deemed to constitute the date of service of any such notice by WRESTLER.

13.7    This Agreement is made in Connecticut and shall be governed by and interpreted in accordance with the laws of the State of Connecticut, exclusive of its provisions relating to conflicts of law.

13.8    The parties agree to submit any and all disputes arising out of or relating in any way to this Agreement exclusively to the jurisdiction of the United States District Court of Connecticut. The provision to submit all claims, disputes or matters in question to the Federal court in the State of Connecticut shall be specifically enforceable; and each party, hereby waiving personal service of process and venue, consents to jurisdiction in Connecticut for purposes of any other party

seeking or securing any legal and/or equitable relief.

13.9 In no circumstances, whatsoever, shall either party to this Agreement be liable to the other party for any punitive or exemplary damages; and all such damages, whether arising out of the breach of this Agreement or otherwise, are expressly waived.

## 14. CONFIDENTIALITY

14.1 (a) Other than as may be required by applicable law, government order or regulations, or by order or decree of the Court, WRESTLER hereby acknowledges and agrees that in further consideration of PROMOTER's entering into this Agreement, and continued Agreement, WRESTLER shall not, at any time during this Agreement, or after the termination of this Agreement for any reason whatsoever, disclose to any person, organization, or publication, or utilize for the benefit or profit of WRESTLER or any other person or organization, any sensitive or otherwise confidential business information, idea, proposal, secret, or any proprietary information obtained while with PROMOTER and/or regarding PROMOTER, its employees, independent contractors, agents, officers, directors, subsidiaries, affiliates, divisions, representatives, or assigns. Included in the foregoing, by way of illustration only and not limitation, are such items as reports, business plans, sales information, cost or pricing information, lists of suppliers or customers, talent lists, story lines, scripts, story boards or ideas, routines, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable) and any other tangible or intangible materials written, composed, submitted, added, improvised, or created by or for WRESTLER in connection with appearances in the Programs, information regarding any contractual relationships maintained by PROMOTER and/or the terms thereof, and/or any and all information regarding wrestlers engaged by PROMOTER.

(b) Notwithstanding the foregoing, WRESTLER's obligation of confidentiality shall not include information which:

(i) at the time of disclosure was in the public domain;

(ii) after such disclosure, becomes generally available to the public other than through any act or omission by WRESTLER; and

(iii) is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to PROMOTER in a timely manner in order to afford PROMOTER an opportunity to seek a protective order against such disclosure.

14.2 WRESTLER acknowledges and agrees that its agreement to be bound by the terms hereof is a material condition of PROMOTER's willingness to use and continue to use WRESTLER's services. Other than as may be required by applicable law, government order or regulation; or by order or decree of the court, the parties agree that neither of them shall publicly divulge or announce, or in any manner disclose, to any third party, any of the specific terms and conditions of this Agreement; and both parties warrant and covenant to one another that none of their officers,

directors, employees or agents will do so either. Notwithstanding the foregoing, WRESTLER shall be free to disclose the terms and conditions of this Agreement to his lawyers, agents, financial advisers and spouse and PROMOTER shall be free to disclose the terms and conditions of this Agreement to its lawyers, accountants and to those employees who have a legitimate need to know such information.

14.3    This Agreement any amendments thereto may be executed in counterparts, each of which shall be deemed to be an original and all of which taken together shall be deemed to constitute the same instrument. Counterparts may be executed either in original or faxed form and the parties adopt any signatures received by a receiving fax machine as original signatures of the parties.

All of the terms and conditions of any Addenda or Schedules are incorporated herein by reference and made a part hereof.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year written below.

WORLD WRESTLING
ENTERTAINMENT, INC.
("PROMOTER")

By: _____
John Laurinaitis
Vice President of Talent Relations

Date: _6 -3-04_

SALVADOR GUERRERO IV
("WRESTLER")

By: _____
Salvador Guerrero IV

Date: _____

STATE OF CONNECTICUT          )
                              ) ss: Stamford
COUNTY OF FAIRFIELD           )

                    June
On April 3 2004 before me personally came John Laurinaitis, Vice President of Talent Relations, to me known, and known to me to be the individual described in, and who executed the foregoing, and duly acknowledged to me that he is a duly authorized corporate officer of World Wrestling Entertainment, Inc., and that he executed the same on behalf of said Company.

                                                        June
WITNESS my hand and notarial seal this _3rd_ day of April, 2004.

My commission expires: _7-31-07_

Margaret M. Ytuarte
Notary Public
**MARGARET M. YTUARTE**
***NOTARY PUBLIC***
MY COMMISSION EXPIRES JULY 31, 2007

22

G:\Department\Legal Affairs\Booking Contracts\Guerrero IV, Salvador 2004 CLEAN 5-18-04.doc

PROVINCE
STATE OF ONTARIO )
                          ) ss:
CITY
COUNTY OF TORONTO )

                          CITY    PROVINCE
    I am a Notary Public for said County and State, do hereby certify that Salvador Guerrero IV personally appeared before me this day and acknowledged the due execution of the foregoing instrument to be his free act and deed for the purposes therein expressed.

                                                        st     June
WITNESS my hand and notarial seal this ____ day of April, 2004.

                                                      _____
                                                         Notary Public

My commission expires: ___N/A___

24
G:\Department\Legal Affairs\Booking Contracts\Guerrero IV, Salvador 2004 CLEAN 5-18-04.doc

## SCHEDULE A
## ORIGINAL INTELLECTUAL PROPERTY

**Salvador Guerrero IV**
**Chavo Guerrero, Jr.**